SETH H. ROW, Bar No. 021845
seth.row@stoel.com
CAMERON C. ZANGENEHZADEH, Bar No. 212756
cameron.zangenehzadeh@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ZENITH ENERGY TERMINALS HOLDINGS LLC, a Delaware limited liability company,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>EXCEL FINISHES & WALLCOVERINGS, INC., an Oregon corporation,<br><br>　　　　　Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>(Breach of Contract, Contractual Indemnity, and Common-Law Negligence) |

## I. NATURE OF THE ACTION

1. Zenith Energy Terminals Holdings LLC ("Zenith") brings this action for breach of contract, contractual indemnity, and common law negligence against Excel Finishes & Wallcoverings, Inc. ("Excel").

2. Zenith and Excel entered into a Master Services Agreement dated February 5, 2019 (the "MSA") setting forth the terms and conditions under which Excel would perform certain work and services for Zenith. On November 8, 2022, and January 25, 2023, Zenith issued purchase orders to Excel to sandblast and paint the exterior of one of Zenith's fuel storage tanks. Both purchase orders specified that "[a]ll work to be performed . . . shall be governed under the terms and conditions of the MSA."

3. On or about May 30, 2023, the storage tank Excel was working on under the purchase orders imploded because Excel left the tank in a dangerous condition overnight. Zenith seeks (1) an award of damages for Excel's common-law negligence, breach of contract, and breach of the duty to indemnify; and (2) an award of Zenith's reasonable attorneys' fees and expenses pursuant to the MSA.

## II. PARTIES

4. Zenith is a Delaware limited liability company, with its principal place of business in Houston, Texas.

5. Excel is an Oregon corporation, with its principal place of business in Oregon City, Oregon.

## III. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over the dispute under 28 U.S.C. § 2201. There is complete diversity of citizenship between the parties and the amount in controversy

exceeds $75,000.  28 U.S.C. § 1332.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Portland, Oregon.

## IV.  GENERAL ALLEGATIONS

### The Master Services Agreement and Purchase Orders

8. Zenith owns an existing petroleum, petroleum products, and renewable fuels bulk distribution terminal and asphalt refinery in Portland, Oregon (the "Portland Terminal").

9. Excel is a specialty painting contractor, operating in the Portland area.  Excel has many years of experience in painting fuel storage tanks, including tanks belonging to Zenith.

10. Zenith and Excel entered into the MSA dated February 5, 2019, setting forth the terms and conditions under which Excel would perform certain work and services for Zenith. A copy of the MSA is attached to this Complaint Exhibit 1.

11. On November 8, 2022, and January 25, 2023, Zenith issued purchase orders to Excel for sandblasting and painting of one of its storage tanks at the Portland Terminal, known as Tank 101. The above purchase orders are attached to this Complaint as Exhibits 2 (11/8/2022) & 3 (1/25/2023).

12. Both purchase orders provided that "[a]ll work to be performed . . . shall be governed under the terms and conditions of the MSA."

### Background Facts

11. Before Excel began its work, Tank 101 had been repaired and cleaned for a new customer to bring in a new product.

13. Tank 101 is located on Zenith's Portland Terminal property in Portland, Oregon as indicated below:



14. During several meetings between Zenith and Excel before Excel began its work, Zenith emphasized the need to keep Tank 101 clean in accord with the customer's expectations.

15. Excel understood that the deadline to complete the work was June 1, 2023.

16. Excel's scope of work was limited to preparing the surface of Tank 101 for painting, which included sandblasting the surface of the tank, and painting the tank.

17. Excel advised Zenith that it would cover the various openings and appurtenances as it performed its work on the tank, in sections. Excel told Zenith they would cover these openings and appurtenances to make cleanup easier.

18. Excel planned to begin sandblasting the roof of the tank during the afternoon of May 30, 2023.

19. The roof of the tank included pressure/vacuum relief vents, sometime alternatively referred to as "vacuum breakers," that are (among other things) designed to prevent a vacuum from forming inside the tank.

20. One of Excel's painters called a Zenith representative on May 30, 2023. The Excel painter asked the Zenith representative by phone if Excel should cover the vacuum breakers and other appurtenances on the roof of Tank 101 where they planned to start sandblasting that afternoon.

21. The Zenith representative advised Excel to proceed with covering the vacuum breakers and other appurtenances on the roof of the tank, but to leave the coverings on the vacuum breakers loose so that the tank could "breathe," meaning that air could flow in or out of the vacuum breaker depending on the differential between the air pressure inside the tank and the air pressure outside of the tank.

22. The Excel painter indicated that he understood and did not ask any additional questions related to the advice given by the Zenith representative.

23. Based on their conversation, the Zenith representative believed that Excel understood the importance of allowing the tank to "breathe."

24. Excel personnel then proceeded to cover the vacuum breakers on the roof using garbage bags.

25. On information and belief, when covering the vacuum breakers on the roof Excel personnel noticed air was flowing from the inside of the tank to the outside of the tank, and Excel personnel made modifications to the garbage bags to allow for the flow of air including specifically cutting slits in some of the garbage bags to allow air to escape.

26. On information and belief, Excel was shorthanded on May 30, 2023, and did not complete enough preparatory work to begin sandblasting that afternoon. Therefore, Excel's personnel left the premises in the afternoon of May 30, 2023.

27. On information and belief Excel's plan was to come back in the morning and start sandblasting the roof at that time.

28. When Excel left the premises, it left the tank with all the coverings over the vacuum breakers in place.

29. On May 30, 2023, at approximately 10:15 P.M., operators working at the rail rack near Tank 101 heard unusual noises followed by a loud pop. When they went to locate the source of the noise, they observed that Tank 101 had collapsed "like a pop can."

30. The sealing of the tank's pressure/vacuum relief vents (vacuum breakers) combined with the temperature differential on May 30, 2023, (a drop of at least 12 degrees overnight) caused a vacuum to form in Tank 101. The vacuum resulted in over one million pounds of force differential across Tank 101's shell, which collapsed (or, more accurately, crushed) Tank 101. This vacuum was a result of the pressure/vacuum relief vents being wrapped by Excel in a manner that restricted air flow back into the tank which would have prevented the vacuum from forming inside the tank and the shell being crushed by the atmospheric pressure on the outside of the tank.

31. Below is a photograph of Tank 101 shortly after the damage to the tank was observed:



32.     The resulting damage to Tank 101 required Zenith to incur substantial costs to repair Tank 101.

33.     Zenith has also suffered a loss of income from the loss of use of Tank 101 while it was being repaired.

**Contract Allegations**

34.     In the recitals to the MSA, Excel asserted it had "the personnel, experience and expertise, to perform . . . work and services" for Zenith.

35.     Section 4.1 of the MSA, governing Professional Standards Warranties, provides:

Contractor warrants and represents that it has the capability, experience, and means required to perform the Work. Contractor warrants and covenants that (a) it will perform the Work using Personnel, equipment, and material qualified and suitable therefor; (b) Contractor will perform the Work (i) in accordance with, and the completed Work shall comply fully with, the Specifications, all requirements of the Agreement, all Applicable Laws, all Permits and all Applicable Codes and Standards, (ii) in a diligent and workmanlike manner and in accordance with Good Industry Practice, and (iii) in accordance with Company's reasonable rules and standards as communicated to Contractor, and (c) the Work will be new and of good quality, free from encumbrances, and free from defects in title, materials,

workmanship and, to the extent the Work includes design or engineer services, free from defects in design ( collectively, the "Warranty").

36. On May 30, 2023, Excel did not have the requisite capability, experience, and means required to perform the Work.

37. On May 30, 2023, Excel failed to perform the Work using personnel, equipment, and material qualified and suitable therefor.

38. On May 30, 2023, Excel failed to comply fully with, the specifications, all requirements of the agreement, all applicable laws, all permits and all applicable codes and standards.

39. On May 30, 2023, Excel failed to perform the Work in a diligent and workmanlike manner and in accordance with good industry practice.

40. On May 30, 2023, Excel failed to perform the Work in accordance with Zenith's reasonable rules and standards as communicated to Excel.

41. On May 30, 2023, Excel failed to ensure the Work was of good quality and free from defects in workmanship.

42. On May 30, 2023, Excel failed to complete the Work to be performed as specified under the MSA and Purchase Orders, failed to perform the Work as warranted, and failed to perform the work in a good and workman like manner.

43. Section 8.1(b) of the MSA, governing Contractor's Indemnities, provides, in relevant part:

> **TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTOR SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS EACH MEMBER OF COMPANY GROUP FROM AND AGAINST** any and all . . . Losses resulting from, arising out of or related to any . . . (ii) damage, loss, or injury to any property of any Related Person, in each case directly or indirectly arising out of, incident to, or in connection with the Work, whether arising in tort, contract, other theory of law (including statute) or otherwise.

44. "Losses" in the MSA is defined to mean "all liabilities, damages, losses, costs and expenses (in each case, including (i) those on account of loss of or damage to property, bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium (parental or spousal), loss of support, death, and wrongful termination of employment) and (ii) litigation and arbitration costs and expenses and reasonable attorneys' fees and expenses) that accrue at any time, whether created by or based upon law (including statute), contract, tort, voluntary settlement or otherwise, or under judicial, administrative or enforcement proceedings or otherwise, or conditions in the premises of or attributable to any Person or Persons or any Party or Parties."

45. "Related Person" is defined in the MSA to mean "any member of the Company Group or the Contractor Group."

46. The "Work" is defined in the MSA to mean "all work and services described in Item 3 of the Work Order and/or any other part or provision of the Agreement."

47. Despite demand, Excel has failed to indemnify Zenith from the Losses suffered by Zenith resulting from the damage to Tank 101 caused by Excel.

## V. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

(Breach of Contract)

48. Zenith realleges and incorporates by reference the allegations in each paragraph above, as if set forth fully herein.

49. The MSA and the Purchase Orders formed a valid and binding contract between Zenith and Excel, setting forth the terms and conditions under which Excel would perform certain work and services for Zenith.

50. Zenith performed all of its obligations under the MSA and Purchase Orders,

excepting any that were excused or as to which performance was impossible.

51. Excel breached its contract with Zenith when it failed to (1) have the requisite capability, experience, and means required to perform the Work; (2) perform the Work using Personnel, equipment, and material qualified and suitable therefor; (3) comply fully with, the Specifications, all requirements of the Agreement; (4) perform the Work in a diligent and workmanlike manner and in accordance with Good Industry Practice; and (5) perform the Work in accordance with Zenith's reasonable rules and standards as communicated to Excel.

52. As a result of Excel's breach of contract, Zenith has been damaged in an amount to be proven at trial but not less than $1,952,861.

53. As a further result of Excel's breach of contract Zenith is further entitled to an award of "costs and expenses and reasonable attorneys' fees" pursuant to Section 8.1(b) and the definition of Losses provided in Section 12.12 of the MSA.

## SECOND CLAIM FOR RELIEF

(Contractual Indemnity)

54. Zenith realleges and incorporates by reference the allegations in each paragraph above, as if set forth fully herein.

55. As a result of Excel's failure to perform the work in a good and workmanlike manner and according to the specifications provided, and the resulting damage to Tank 101, Zenith suffered Losses as defined in Section 8.1(b) and Section 12.12 of the MSA.

56. The Losses Zenith incurred resulted from, arose out of, and were related to damage, loss, and injury to Zenith's property, either directly or indirectly arising out of, incident to, or in connection with the Work performed by Excel.

57. Despite demand, Excel has failed indemnify and hold Zenith harmless from and against any and all Losses resulting from, arising out of or related to any damage, loss, or injury to Zenith's property, either directly or indirectly arising out of, incident to, or in connection with the Work.

58. As a result of Excel's breach of its agreement to indemnify Zenith against Losses, Zenith has been damaged in an amount to be proven at trial but not less than $1,952,861.

59. As a further result of Excel's failure to indemnify Zenith against Losses, Zenith is entitled to an award of "costs and expenses and reasonable attorneys' fees" pursuant to Section 8.1(b) and the definition of Losses provided in Section 12.12 of the MSA.

### THIRD CLAIM FOR RELIEF

(Common-Law Negligence)

60. Zenith realleges and incorporates by reference the allegations in each paragraph above, as if set forth fully herein.

61. Excel owed Zenith a duty to perform work and services commensurate with industry standards.

62. Excel breached that duty. That breach was the cause-in-fact of property damage to Tank 101 including damage to property outside of the scope of Excel's work.

63. Excel's conduct caused a foreseeable risk of harm.

64. The risk to Zenith's property created by Excel's conduct was of a type protected by Oregon law.

65. Excel's conduct was unreasonable in light of the risk.

66. Zenith was within the class of persons recognized as protected under Oregon law.

67. Zenith's injury was within the general type of potential incidents and injuries that made Excel's conduct negligent.

68. As a direct and proximate result of Excel's negligence, Zenith has been damaged in an amount to be proven at trial but not less than $1,952,861.

## PRAYER FOR RELIEF

WHEREFORE, Zenith requests the following relief:

A. On its first claim for relief, for judgment in its favor and against Excel in an amount to be proven at trial, but not less than $1,952,861;

B. On its second claim for relief, for judgment in its favor and against Excel in an amount to be proven at trial, but not less than $1,952,861;

C. On its third claim for relief, for judgment in its favor and against Excel in an amount to be proven at trial, but not less than $1,952,861;

D. For its attorneys' fees, costs, and disbursements pursuant to the MSA;

E. For prejudgment interest at the highest statutory rate;

F. For such other relief as the Court may deem just, equitable, and proper.

DATED: March 4, 2024                    STOEL RIVES LLP

*s/Seth H. Row*
SETH H. ROW, Bar No. 021845
seth.row@stoel.com
CAMERON C. ZANGENEHZADEH, Bar No. 212756
cameron.zangenehzadeh@stoel.com

*Attorneys for Plaintiff*